Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/01/2017 09:11 AM CDT

- 818 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI Worldwide Corp., a Nebraska corporation,
appellant, v. Baldwin Hackett &
Meeks, Inc., et al., appellees.

___ N.W.2d ___

Filed June 9, 2017.    No. S-16-358.

1. **Motions to Vacate: Proof: Appeal and Error.** An appellate court will reverse a decision on a motion to vacate or modify a judgment only if the litigant shows that the district court abused its discretion.

2. **Motions for New Trial: Appeal and Error.** An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion.

3. **Pretrial Procedure: Appeal and Error.** Decisions regarding discovery are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion.

4. **Verdicts: Appeal and Error.** When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.

5. **Verdicts: Juries: Appeal and Error.** A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.

6. **Trial: Expert Witnesses: Appeal and Error.** A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.

7. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

8. **Attorney Fees: Appeal and Error.** When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion.

9. **Appeal and Error.** To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

- 819 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

10. **Trade Secrets: Pretrial Procedure.** There is no talismanic procedure for trade secret discovery that may be used to obtain the best results in any given case.

11. ____: ____. In determining whether a party's trade secret information should be discoverable, the moving party's need for the trade secret information must be weighed against the injury that disclosure might cause the party opposing the discovery.

12. **Torts: Parties.** Under the doctrine established by *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and *Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), a party is protected from tort liability for the act of filing a lawsuit.

13. **Torts.** The doctrine established by *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and *Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), does not protect a party from liability for the act of filing a "sham" lawsuit. A lawsuit is a "sham" if it is both (1) objectively baseless in the sense that no reasonable litigant could expect success on the merits and (2) subjectively motivated by bad faith.

14. **Pleadings.** An affirmative defense raises new matters which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.

15. ____. The doctrine established by *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and *Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), is an affirmative defense.

16. **Vendor and Vendee.** For purposes of the Junkin Act, monopolization consists of two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

17. ____. The existence of monopoly power ordinarily is inferred from the seller's possession of a predominant share of the market.

18. **Vendor and Vendee: Damages.** Despite the broad remedial language of the Junkin Act, not every person claiming an injury from a Junkin Act violation can recover damages.

19. **Vendor and Vendee: Damages: Proof.** To recover damages, a plaintiff must prove an antitrust injury. To constitute an antitrust injury, the injury must reflect the anticompetitive effect of the violation or the anticompetitive effects of anticompetitive acts made possible by the violation.

20. **Vendor and Vendee.** Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality.

- 820 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

21. **Contracts: Appeal and Error.** The interpretation of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.

22. **Contracts.** When the terms of a contract are clear, they are to be accorded their plain and ordinary meaning.

23. **Trial: Expert Witnesses: Appeal and Error.** There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.

24. **Trial: Expert Witnesses.** Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.

25. **Trial: Rules of Evidence: Expert Witnesses.** A witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.

26. **Damages: Evidence: Proof.** A plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural, but proof of damages to a mathematical certainty is not required; the proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness.

27. **Words and Phrases.** Overhead costs are business expenses that cannot be allocated to a particular service or product.

28. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is a factor only when the rules make such discretion a factor in determining admissibility.

29. **Trial: Evidence: Appeal and Error.** To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about evidence admitted or excluded.

30. **Trial: Presumptions: Waiver.** Generally, a motion which is never called to the attention of the court is presumed to have been waived or abandoned by the moving party, and, where no ruling appears to have been made on a motion, the presumption is, unless it otherwise appears, that the motion was waived or abandoned.

31. **Attorney Fees.** If an attorney seeks a statutory attorney fee, that attorney should introduce at least an affidavit showing a list of the services rendered, the time spent, and the charges made.

- 821 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

32. ____. An award of attorney fees involves consideration of such factors as the nature of the case, the services performed and results obtained, the length of time required for preparation and presentation of the case, the customary charges of the bar, and general equities of the case.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Gregory C. Scaglione, Patrice D. Ott, and John V. Matson, of Koley Jessen, P.C., L.L.O., and Eric J. Magnuson, Ryan W. Marth, and Christopher P. Sullivan, of Robins Kaplan, L.L.P., for appellant.

Michael F. Coyle, Timothy J. Thalken, and Robert W. Futhey, of Fraser Stryker, P.C., L.L.O., for appellees.

HEAVICAN, C.J., WRIGHT, CASSEL, STACY, KELCH, and FUNKE, JJ.

KELCH, J.

## I. NATURE OF CASE

In September 2012, ACI Worldwide Corp. (ACI) sued Baldwin Hackett & Meeks, Inc. (BHMI); its cofounders; and other BHMI principals. The primary claims involved in this case are ACI's claim that BHMI misappropriated its trade secrets and BHMI's counterclaims that ACI tortiously interfered with a business relationship, breached a nondisclosure agreement, and violated provisions of Nebraska's unlawful restraint of trade statutes (referred to as the "Junkin Act").[1] In a 2014 trial, a jury found that ACI had not met its burden of proof with respect to its misappropriation claim. In a 2015 trial, a jury found in favor of BHMI on all of its counterclaims and awarded BHMI $43,806,362.70. The district court awarded BHMI $2,732,962.50 in attorney fees and $7,657.93 in costs.

ACI filed motions to vacate the 2014 and 2015 judgments, reopen the evidence, and grant ACI a new trial on the basis

---

[1] See Neb. Rev. Stat. §§ 59-801 to 59-831 (Reissue 2010).

that it had discovered new evidence. This "new" evidence was trade secret information, which the district court had previously ruled could not be discovered until ACI conducted more non-trade-secret discovery to support its claims. However, ACI obtained the evidence in a federal action against one of BHMI's customers. The district court overruled ACI's posttrial motions, and ACI appeals.

## II. FACTS

### 1. PRELITIGATION

ACI and BHMI are competitors in the business of developing and licensing electronic payment processing software, including "middleware." Middleware is computer software that enables other software applications to communicate with one another by routing messages between them. Two different middleware programs are involved in this case: (1) ACI's middleware, "NET24-XPNET" (XPNET), and (2) BHMI's middleware, "Concourse - TMS" (TMS).

### (a) Middleware Programs

#### (i) XPNET

ACI's XPNET software has been the primary middleware in the electronic payments market for the past 40 years, and it generates approximately $52 million in annual revenue for ACI. Of the approximately 350 worldwide customers in the market, approximately 300 customers use XPNET. One of those customers is MasterCard International, LLC (MasterCard).

By itself, XPNET does not do anything. In order for a customer like MasterCard to use XPNET, it must purchase or develop a program to "bolt onto" XPNET. To "bolt onto" XPNET, MasterCard purchased a program known as the MasterCard Debit Switch or MDS.

In a March 2008 letter, ACI announced to MasterCard and other customers that it intended to transition all customers from "BASE24," which XPNET is a part of, and which runs exclusively on Hewlett Packard (HP) NonStop hardware, to "BASE24-eps," which would run on IBM hardware. In the

- 823 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

letter, ACI advised its customers that it would no longer provide routine enhancements or support for BASE24.

After the March 2008 announcement, ACI's customers became concerned that they would have to license all new software and purchase new IBM hardware, resulting in the loss of their significant investment in the HP NonStop hardware. MasterCard representatives met with HP representatives to discuss the future of HP hardware. When the topic of middleware came up, HP recommended that MasterCard take a look at BHMI, who had previously worked for HP on a project.

### (ii) TMS

In April 2008, a sales representative from HP contacted BHMI to see if BHMI would be interested in developing an XPNET replacement for MasterCard. BHMI indicated that it was interested, and in mid-April, HP, MasterCard, and BHMI had a preliminary conference call to discuss BHMI's capabilities and MasterCard's requirements and interest in replacing XPNET.

In April 2009, MasterCard entered into a contract with BHMI to develop the XPNET replacement. MasterCard wanted a middleware that could be used not only on HP NonStop hardware, but on other platforms as well. BHMI developed TMS, which was designed to run on all major types of hardware.

In June 2010, MasterCard sent ACI a notice that it would not renew its contract for XPNET. By May or June, TMS had been delivered to MasterCard, and MasterCard was testing it by running it on various components of its network. On August 20, MasterCard accepted TMS.

In December 2010, BHMI began to market TMS and issued a press release announcing that MasterCard had replaced XPNET with TMS and that TMS would be commercially available to other HP NonStop users.

### (b) ACI Meets With BHMI

In late December 2010, ACI contacted BHMI and requested a meeting to discuss ACI's concerns that BHMI had used

- 824 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI's proprietary information to develop TMS. BHMI denied ACI's accusation and agreed to meet so long as ACI provided an agenda prior to the meeting and signed a nondisclosure agreement. ACI and BHMI exchanged at least six versions of the nondisclosure agreement before agreeing on the final version. The final version of the nondisclosure agreement (NDA) contained a provision that ACI would not utilize the confidential information of BHMI in any manner, including in a legal action against BHMI or its customers.

After the NDA was signed, BHMI met with Charles Linberg, ACI's chief technology officer, and Alan Hoss, another ACI employee, to discuss how TMS operated. At the conclusion of the meeting, Linberg and Hoss requested to see the source code and manuals for TMS. After an internal discussion, BHMI agreed to allow Linberg and Hoss to review the technical manuals for TMS.

## 2. ACI's Complaint and BHMI's Countersuit

In September 2012, ACI filed a complaint against BHMI and its officers, alleging eight causes of action: breach of contract, misappropriation of trade secrets, fraud, unjust enrichment, tortious interference with business relations and expectations, conversion, trespass to chattels, and civil conspiracy. All of these claims, except for the claim of misappropriation of trade secrets against BHMI, were dismissed through pretrial motions. To support its claim of misappropriation of trade secrets, ACI alleged in its complaint that "BHMI agreed to allow ACI representatives to conduct an examination of the operations, configurations, and application programming manuals related to [TMS]" and that "[a]s a result of the inspection, ACI found a high degree of conceptual similarity . . . ."

BHMI countersued, alleging that ACI had (1) breached the NDA by utilizing BHMI's confidential information in a legal action against BHMI; (2) tortiously interfered with BHMI's prospective business relationships by falsely claiming that TMS was the product of infringement, which placed a cloud

- 825 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

over TMS and prevented BHMI from marketing or licensing it; and (3) violated the Junkin Act, which is Nebraska's counterpart to the federal antitrust laws, i.e., the Sherman Act and the Clayton Act.[2]

In November 2012, the first hearing was held. At the hearing, BHMI asked for expedited discovery because of the impact that the litigation was having on BHMI's ability to market TMS. Counsel for ACI stated that "we certainly welcome expedited discovery."

### 3. Discovery

#### (a) ACI's Motions to Compel BHMI to Produce Trade Secret Information

In December 2012, before ACI had even served written discovery on BHMI, ACI filed a motion to compel BHMI to produce trade secret information, including TMS' source code and manuals. In the same motion, ACI sought a protective order for its own trade secret information. In support of its motion to compel, ACI alleged that ACI employees had reviewed TMS manuals and found a high degree of similarity between XPNET and TMS. In the motion, ACI proposed that BHMI disclose its source code and manuals to an expert hired by ACI, who would review the information and provide to ACI an opinion as to whether misappropriation had occurred. ACI would then decide whether to continue its suit, and if it did, then ACI would submit its trade secret information to an expert hired by BHMI.

After three hearings on ACI's motion, which are described below, the district court overruled ACI's motion to compel, indicating that it would consider granting a similar motion in the future, provided that ACI conducted some non-trade-secret discovery.

---

[2] *Credit Bureau Servs. v. Experian Info. Solutions*, 285 Neb. 526, 531, 828 N.W.2d 147, 151 (2013) (citing *Pierce Co. v. Century Indemnity Co.*, 136 Neb. 78, 285 N.W. 91 (1939)).

- 826 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

### (i) February 2013 Hearing

The first hearing on ACI's motion to compel was held in February 2013. In opposition to the motion, BHMI argued that under Nebraska case law, before ACI could gain access to BHMI's trade secrets, ACI must set forth with particularity what trade secrets of XPNET it contends BHMI misappropriated. BHMI also expressed concern that under the plan proposed by ACI, BHMI's biggest competitor, ACI's expert would have access to its most sensitive information, and that if ACI decided not to continue the suit, then ACI would never have to disclose the information contained in the expert's report, nor would there be any "checks" on what ACI did with that information. ACI argued that it had pled its misappropriation claim with sufficient particularity when it pled that TMS and XPNET were similar in conception and implementation and that it needed BHMI's source code to prove its claims.

After hearing the parties' arguments, the district court told ACI:

> I want you to get what you need, but I understand completely [BHMI counsel's] need to protect his client, too, at the same time. So — these trade secret cases and confidential information cases are kind of tricky sometimes, and I understand both needs here. You can't be so handcuffed you can't prove your case; but, on the other hand, I just don't think because they get sued they have to turn over everything to you that could damage — potentially damage them far beyond just disclosing the limited amount of information.

The court stated, "I think the best thing to do would be to respond — to provide with particularity what it is you believe they have done and then we'll decide the most limited way that you can obtain the information that you believe you need." The court then decided to hold ACI's motions in abeyance until such time as ACI produced with particularity what it believed BHMI had misappropriated.

- 827 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

### (ii) April 2013 Hearing

The second hearing on ACI's motion was held in April 2013. At this hearing, ACI offered exhibit 5, which was a response to interrogatories, in support of its motion. ACI asserted that exhibit 5 identified with particularity the trade secrets it contended BHMI misappropriated. However, BHMI argued that the characteristics identified in exhibit 5 were not ACI's trade secrets, but characteristics of every middleware program and were available in the public domain. BHMI argued that before ACI could gain access to its trade secret information, ACI must show that the information in exhibit 5 is a trade secret and that it was misappropriated by BHMI. The district court agreed and again held ACI's motion in abeyance.

### (iii) May 2013 Hearing

In May 2013, another hearing was held on ACI's motion to compel. This time, ACI offered a document referred to as ACI's "trade secret statement." In the statement, ACI aimed to show what information it believed BHMI had misappropriated and that such information was a trade secret. To prove that the information was a trade secret, ACI illustrated the steps ACI had taken to keep the information a secret and the economic value that XPNET had to ACI.[3] ACI also alleged in the statement that it was convinced BHMI stole the information, but it did not know how.

In opposition to the motion, BHMI offered Linberg's deposition, which BHMI argued showed that ACI did not have a good faith basis for its lawsuit against BHMI and that therefore ACI was not entitled to trade secret discovery. ACI had identified Linberg as one of two people who had knowledge of BHMI's alleged improprieties. So, at the deposition, counsel for BHMI

---

[3] See Neb. Rev. Stat. § 87-502(4)(a) (Reissue 2014) (defining "[t]rade secret" as information that "[d]erives independent economic value, actual or potential, from not being known to . . . other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

- 828 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

asked Linberg for all the bases Linberg had for believing that BHMI had misappropriated ACI's proprietary information. Linberg testified that he believed BHMI had misappropriated ACI's proprietary information after he saw BHMI's marketing materials and website, because "it would be impossible for any other company to develop a software system that does the same functions that [XPNET] does without stealing [ACI's] trade secrets." BHMI counsel asked Linberg, "So even if we were to come forward and produce all of our software code and it's completely different but it does the same thing [as XPNET], you still believe that it's a violation of your trade secrets?" Linberg replied, "[Y]es." Linberg testified that even if he had not met with BHMI and reviewed its manuals, ACI still would have sued BHMI.

After hearing both parties argue, the court reserved ruling until it received BHMI's brief.

### (iv) Order Overruling ACI's
### Motion to Compel

On July 29, 2013, the district court issued an order overruling ACI's motion to compel BHMI to produce its source code and manuals. In the order, the court agreed with ACI that it was not "required at this stage of litigation to prove exactly how and when the trade secrets were allegedly misappropriated," but stated that ACI "should not be able to gain unfettered access to [BHMI's] own valuable trade secrets simply by making the allegation [that BHMI misappropriated ACI's proprietary information]."

The court noted its broad discretion under Neb. Ct. R. Disc. § 6-326 of the Nebraska Rules of Discovery to limit the time, place, and manner of discovery as required "'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" Additionally, the court noted its "broad discretion to modify the timing and sequence of discovery 'for the convenience of the parties and witnesses and in the interests of justice.'" The court then stated:

- 829 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

Under a properly crafted protection order, the Court would be inclined to allow discovery of the source code, if and when there is significantly more evidence to support [ACI's] allegations. At this juncture, there are the allegations contained in [ACI's] Complaint, denials in [BHMI's] Answer, and testimony of [ACI's] representative, [Linberg]. Short of ordering BHMI to produce its source code to [ACI's] expert, there would appear to be any number of means of discovery that may uncover evidence of plagiarizing, including depositions of MasterCard representatives, [BHMI], current and former employees of [BHMI], third-party contractors of BHMI, as well as subpoenas for documents from MasterCard and third-party contractors, and, of course, requests for production of documents from [BHMI].

### (b) Further Discovery: MasterCard

In August 2013, ACI served MasterCard with a subpoena duces tecum. In the subpoena, ACI requested that MasterCard produce, among other documents, TMS' manuals and any documents showing MasterCard's requirements and specifications for TMS. After MasterCard indicated that it would not produce these documents, ACI filed a "Motion to Clarify Order Regarding Source Code and Notice of Hearing."

### (i) ACI's First Motion to Clarify

At the hearing on ACI's motion to clarify, the district court stated that it did not intend "to just allow [ACI] to go to MasterCard and get what we're not disclosing yet from BHMI." ACI argued that it was not asking for all of BHMI's manuals, but for manuals that BHMI had given to MasterCard during the development of TMS. Counsel for BHMI agreed that any exchanges between MasterCard and BHMI made *before BHMI entered into a contract* with MasterCard were "fair game." But counsel for ACI clarified that ACI wanted all exchanges made before the *delivery* of TMS, including exchanges made after the parties entered into an agreement.

Because it seemed that the parties might be able to reach an agreement as to what ACI could discover from MasterCard, the court directed the parties to work together to draft a protective order to govern the MasterCard discovery. Although the parties agreed on a protected order, they did not reach an agreement as to whether postcontract, predelivery exchanges were discoverable.

After the hearing, MasterCard produced some of the documents requested by ACI. However, MasterCard did not produce "Requirements Documents" or "External Specification Documents," because it believed doing so would violate the district court's July 29, 2013, order. The "Requirements Documents" and "External Specification Documents" were sent to MasterCard as attachments in emails. MasterCard produced the emails to which the documents were attached, but not the attachments. After MasterCard refused to disclose those attachments, ACI filed a motion to compel MasterCard to produce the email attachments.

### (ii) September 2013 Hearing

In September 2013, a hearing was held on ACI's motion to compel MasterCard to produce the email attachments. At the hearing, ACI argued that certain emails produced by MasterCard showed that the attachments at issue must have contained ACI's trade secrets. In support of its argument, ACI pointed to an email sent from MasterCard to BHMI, wherein MasterCard answered some questions that BHMI asked in the course of developing TMS. In the email, BHMI asked questions such as, "What is the MSG Transparent field in the header used for? I don't think TMS has any need for this." ACI claimed that "MSG Transparent" relates to XPNET and argued that MasterCard must have given BHMI information about XPNET in order for BHMI to ask this question. ACI also pointed to a document that contained an action list, which was sent from MasterCard employee Theresa LaRosa to other MasterCard employees. Under the name "Kim Hall," the document stated,

- 831 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

"Provide BHMI current setup of XPNet external processes and how these configurations are cycled in."

MasterCard argued that ACI was again seeking documents from MasterCard that it was precluded from getting from BHMI. MasterCard asserted that both the "Requirements Documents" and the "External Specification Documents" were sent to MasterCard from BHMI and contained BHMI's confidential trade secret information, including manuals and hundreds of pages describing the functionality and design of TMS. MasterCard also argued that it was precluded from producing the attachments because MasterCard had signed nondisclosure agreements with BHMI.

BHMI agreed that the email attachments were confidential trade secret information and asked the court to overrule the motion. BHMI also argued that even though the document with the action list suggested that MasterCard had planned to provide BHMI with XPNET information, ACI had not produced any evidence that such an action was ever taken. BHMI asserted that ACI was set to depose a MasterCard representative in October 2013 and argued that ACI had "more than adequate evidence and paperwork to go take the deposition." BHMI suggested that if ACI could produce additional evidence in support of its claims as a result of the deposition, then the court could reconsider its decision to allow ACI to discover the attachments.

After hearing the parties argue their positions, the district court asked ACI if it could proceed with the MasterCard deposition without the attachments and then report back to the court with more specific information regarding BHMI's alleged misappropriation. ACI indicated that it could not "take a meaningful deposition" without those documents.

The district court then suggested a number of questions that ACI could ask to solicit information about the email attachments. The court suggested for example that ACI could "depose any number of MasterCard authors of these e-mails [and ask them:] What did you mean by this? What did you

- 832 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

send?" The district court also suggested that ACI could "ask [BHMI's employees:] Why did you ask the question [about MSG Transparent field in the header]? Why did you use that term? Isn't that an XPNET header field?" The court stated that if the answers to the depositions were "not enough, they're guarded, they're deceptive, there is a lot of, I don't recall, I don't remember," then the court would entertain expanding the scope of discovery.

### (iii) MasterCard Deposition:
### Stephen Birge

On October 2, 2013, ACI deposed Stephen Birge, a senior business leader at MasterCard. ACI asked Birge about the email attachments. Birge testified that one of the documents was "BHMI created" and was a "very high level proposal to MasterCard." Another document contained "some of the header fields that the MDS [MasterCard debit switch] application was using at that time," which was "produced by looking at the MDS source code." As stated above, MDS was an application that MasterCard had purchased to "bolt onto" XPNET. Birge testified that the MDS source code did not contain any components of XPNET and that MasterCard never provided BHMI with any of the ACI header layouts. When asked whether "bits of information in the MDS source code [were] only there because . . . MasterCard used XPNET for its middleware," Birge stated that he did not know the origin of particular lines of code.

Birge also testified that MasterCard never provided BHMI with a written list of MasterCard's requirements for TMS. According to Birge, "since TMS was already 80 percent [written]" when MasterCard met with BHMI, MasterCard and BHMI merely had a "back and forth dialogue" about what was already written and what MasterCard needed.

Birge was also asked about the action list, wherein "Kim Hall" was to "[p]rovide BHMI current setup of XPNET external processes . . . ." Birge testified that he did not know if Hall

- 833 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ever provided that information to BHMI, but he did not see it upon his review of MasterCard documents. Birge believed that whoever created the action list was using the term "XPNET" as a generic term for middleware and that the intent was not to send BHMI the XPNET information, but to provide them with information about "processes that run outside of middleware control."

In the 3 months following Birge's deposition, ACI did not communicate with MasterCard and did not request any further information from MasterCard. Additionally, ACI did not and had not requested any depositions of BHMI or any of its employees.

### (c) BHMI's Motion for Summary Judgment and ACI's Motions to Compel MasterCard and BHMI

On December 27, 2013, BHMI filed a "Motion for Summary Judgment" in favor of BHMI on all issues. One week later, ACI filed a motion to continue BHMI's motion for summary judgment, as well as a motion to compel MasterCard to produce documentation of all the documents it was withholding pursuant to the July 29 protective order. On January 30, 2014, a hearing was held on BHMI's motion for summary judgment and ACI's motion for a continuance.

### *(i) January 30, 2014, Hearing*

ACI argued that it needed a continuance for the motion for summary judgment because, without the email attachments, ACI could not yet prove its case. To persuade the district court to allow ACI to discover the email attachments, ACI pointed to Birge's deposition, wherein Birge was unable to recall, without referencing the attachments, exactly what information MasterCard sent to BHMI.

In opposition to ACI's motion to continue, BHMI reminded the district court of the parties' request for expedited discovery and argued that ACI was not actively pursuing discovery.

- 834 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

After hearing the parties' arguments, the district court offered ACI 30 days to submit evidence and any resistance, but indicated that BHMI's motion for summary judgment was not premature. ACI argued that to defend the motion for summary judgment within 30 days, ACI would need a ruling on its motion to compel production from MasterCard. Although ACI had not requested a hearing on that motion, the district court stated that it would do "everything in [its] power" to get ACI an expedited hearing on that matter. Additionally, although ACI had not previously requested a deposition of BHMI or any of its employees, counsel for BHMI offered to "make somebody available from [BHMI] for deposition in the next 30 days."

### (ii) February 7, 2014, Hearing

One week later, the district court held a hearing on ACI's motion to compel production from MasterCard. In support of its motion to compel, ACI again argued that it was unable to properly depose Birge without the attachments. ACI argued that the documents were "crucial for [ACI] to examine the BHMI representatives . . . and to further examine MasterCard."

In opposition to ACI's motion, MasterCard argued that although counsel for ACI "would lead [the court to] believe that [Birge was] not prepared to testify" on the documents ACI was requesting, "the requirements document was the subject of over 20 pages of testimony in a seven-hour deposition." MasterCard argued that it had already produced over 19,000 pages of documents and that all of the documents that ACI sought were all within BHMI's possession. Thus, MasterCard argued, if ACI is entitled to the documents, it should get them from BHMI.

The district court agreed with MasterCard, stating, "I'm going to overrule the motion to compel as against MasterCard. I'm not saying you're not entitled to this information; but I think to the extent you're entitled to it, it needs to come from BHMI."

- 835 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

Later that day, ACI filed a motion to compel BHMI to produce the email attachments. A hearing on the motion was held on February 25, 2014.

### (iii) February 25, 2014, Hearing

At the hearing, ACI argued that it should at least be able to discover the attachments that MasterCard had sent to BHMI, because those attachments were from MasterCard and therefore were not BHMI's proprietary information.

BHMI advised the court that on January 31, 2014, ACI had filed a suit against MasterCard in the U.S. District Court for the District of Nebraska.

After hearing both parties, the district court commented:

> [O]ne of the problems with . . . these type of cases, is that both sides are a little bit at a disadvantage, because you think something happened and you're trying to prove it. That's your burden. They say it didn't, and why would we have to turn stuff over when we don't think there's any evidence that says we did what you're alleging. You're both kind of handcuffed a little bit.
>
>   . . . I think I kind of discussed this a little bit in one of my first orders in this case . . . . Basically you're asking the defendants in this case to reveal everything they got from MasterCard, and you got MasterCard's trade secrets, you've got BHMI's trade secrets, you've got your trade secrets. You're trying to protect yours, they're trying to defend and protect theirs, yet you want them to disclose things that they shouldn't have to disclose if they didn't do anything wrong.

The court told counsel for ACI, "I'm very sympathetic to your plight," but added, "Basically what you're asking me to do is order BHMI to turn over the trade secrets, if you will, of MasterCard, while you're in the process of suing them for $40 million . . . ."

The district court suggested a number of ways that ACI could proceed with discovery without the email attachments. It asked counsel for ACI, "Did you depose [Theresa] LaRosa?"

- 836 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI's counsel stated, "Not yet." The court asked, "When do you intend to do so? Because she's the one that wrote this [action list]." The court also asked ACI, "Did you depose Kim Hall? . . . She's on this as the person that's going to provide BHMI the current set of XPNET external processes . . . ." ACI responded, "I certainly will, Your Honor." The court also asked, "Did you depose the people who actually sent the [e]mails [with the attachments]?" Counsel for ACI responded, "No, not yet." The court then advised ACI that it should go take depositions. It told ACI, "I'm not precluding or pre-deciding any issue, but I think it's premature until these individuals are deposed. And once it's completed, if you want to spend more time on this issue, either party, I'd be more than happy to provide the time."

### (iv) Order on Motion for
### Summary Judgment

After another hearing on BHMI's motion for summary judgment, the district court issued an order granting summary judgment in favor of BHMI as to all of ACI's claims, except the claim of misappropriation of trade secrets.

### (d) ACI's Motions to Continue Trial
### and to Compel Production of
### BHMI's Trade Secrets

In April 2014, ACI filed a motion to continue the trial, which had been set for July 28. On the same day, ACI also filed a motion to compel the production of the email attachments and TMS' source code and manuals, as well as a motion to renew its prior motions to compel. A hearing on those motions was held on June 25.

### (i) June 25, 2014, Hearing

In support of its motion to continue trial, ACI argued that just 5 days prior, BHMI had identified three new expert witnesses that were not previously disclosed and had claimed damages in excess of $20 million. ACI argued that it needed

- 837 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

to analyze the information relating to damages and to depose the newly identified witnesses.

In response, BHMI argued that ACI has been aware of the damages it was going to claim for months. In March 2014, a BHMI employee had testified that BHMI was estimating prospective damages in excess of $10 million and that First National Bank of Omaha had canceled a seven-figure contract based solely on ACI's lawsuit. BHMI also argued that it had been 2 years since ACI filed the lawsuit and "they've got nothing."

The court indicated that it did not want to delay the trial on ACI's claims, but that it was willing to bifurcate the case into two trials. It suggested that the first trial be on ACI's claims against BHMI and that the second trial be on BHMI's claims against ACI. ACI admitted that bifurcation would solve some of the "recent disclosure issues," but maintained that there were a lot of other reasons why the trial on ACI's claims should be delayed. For example, ACI asserted that MasterCard had refused to consent to depositions of its employees. But when asked whether ACI had subpoenaed those witnesses, ACI indicated that it had not.

In support of ACI's motion to compel, ACI argued that it had presented sufficient evidence for the district court to allow discovery of the trade secret information: It had produced a "trade secret statement"; it had produced BHMI's contract with MasterCard, wherein it referenced XPNET functionality; and it had produced MasterCard's action list, wherein it stated that Hall should "'[p]rovide BHMI current setup of XPNET external processes . . . .'"

After ACI referenced the action list, the district court asked ACI if it ever took the depositions of Hall and LaRosa. Counsel for ACI stated, "I want to, Your Honor," to which the court asked ACI, "Well, why haven't you?" Rather than explaining why ACI had not taken the depositions, counsel for ACI gave the court a history of its efforts to get access to BHMI's trade secrets.

- 838 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI then told the court, "Your Honor, we need the e-mail attachments. I don't know how we try this case without them." After approximately 30 pages of argument, the district court indicated that without any new evidence, it was not going to change its previous rulings.

### (ii) District Court's
### July 14, 2014, Order

On July 14, 2014, the district court issued an order, which, among other things, overruled ACI's motion to continue trial. In the order, the court noted that although the case was filed in September 2012, no depositions were taken until May 2013, when BHMI deposed ACI representative Linberg. The court wrote, "As of this writing in late June, 2014, so far as the Court can tell, only 4 other depositions have been taken": Birge, the MasterCard representative, and three BHMI employees.

The district court also noted that although ACI knew the trial date was approaching, ACI has "resisted to this point the Court's encouragement to engage in vigorous non trade secret discovery." The court stated that "the only significant evidence" that ACI presented of plagiarism was the affidavit of an ACI employee, stating that he reviewed emails transmitting information from MasterCard to BHMI and that based on his review, he strongly believed that MasterCard had provided BHMI with ACI's proprietary information. The district court noted that the emails referenced in the affidavit were between 11 different MasterCard employees and that ACI had not deposed any of them.

The district court ended its order stating:

> To be absolutely clear, the Court has never taken the position that [ACI] could not have access to the source codes under any circumstances. The Court has simply asked for evidence to be produced that supports a certain level of probability that plagiarism occurred before triggering the disclosure of the source code and related materials.

- 839 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

### 4. First Trial: ACI's Claims Against BHMI

ACI's claims against BHMI were tried in July and August 2014. At the trial, as ACI states in its brief on appeal, "ACI was forced to rely on circumstantial evidence as to what was disclosed to and used by BHMI," such as "the fact that communications were flowing back and forth" and "the necessity of XPNET trade secrets being incorporated into TMS for the MDS to function properly in the manner BHMI claimed."[4]

Although the district court denied BHMI's motion for directed verdict, concluding "there's enough evidence for the jury to consider the misappropriation of trade secrets," the jury ultimately returned general verdicts that ACI had not met its burden of proof on any of its claims.

### 5. Between Trials

On March 6, 2015, pursuant to ACI's federal action against MasterCard, ACI was able to obtain the attachments to the emails from MasterCard to BHMI. In June or July, the federal court granted ACI's motion to amend the protective order to allow ACI to use the email attachments in the state court case.

#### (a) July 2015 Motions

In July 2015, a series of motions were filed by both parties. On July 13, ACI filed a motion for summary judgment as to all BHMI's counterclaims, and on July 17, it filed a motion to vacate the 2014 verdicts and associated judgments, reopen discovery, and grant a new trial. On July 26, BHMI filed a motion to continue the hearings on ACI's motions, and ACI filed another motion to continue trial. On July 31, a hearing was held on (1) ACI's motion for summary judgment, (2) ACI's motion to vacate the 2014 judgment, and (3) BHMI's motion to continue the hearings for ACI's motion for summary judgment and motion to vacate the 2014 judgment.

---

[4] Brief for appellant at 17.

### (i) Motion for Summary Judgment

In support of its motion for summary judgment, ACI argued, among other things, that BHMI's damages evidence was impermissibly speculative and that the breach of contract claim based on the NDA was inadequate "as a matter of law." ACI also argued that the *Noerr-Pennington* doctrine immunized ACI from claims relating to the filing of its lawsuit.[5] According to the record on appeal, this hearing was the first time ACI ever raised the *Noerr-Pennington* defense. ACI's motion for summary judgment was overruled.

### (ii) ACI's Motion to Vacate
### 2014 Judgment

In support of ACI's motion to vacate the 2014 judgment, ACI advised the district court of the documents it obtained during federal discovery. It also represented to the district court that the attachments had been given to Mark Newsom, a principal software engineer from ACI who works on XPNET. Newsom created a report, which, according to ACI, showed that the email attachments contained both paraphrased information as well as "direct quotes" from XPNET's manuals.

BHMI sought to continue this motion until after the second trial, arguing that ACI had not produced to BHMI the email attachments, any portions of the XPNET manuals, or Newsom's report. BHMI also argued that only 6 weeks remained until the second trial. The district court agreed that there was no reason to "mess with it right now."

There was also some discussion as to whether the email attachments could be produced at the second trial. ACI argued that the attachments were relevant to the breach of the NDA claim, because per the NDA, BHMI's "Confidential Information" did not include information that was independently developed by ACI.

---

[5] See *Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and *Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965).

- 841 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI then offered the email attachments "in support of the motion to reopen discovery, vacate orders, grant and set a new trial, and the other relief set forth in the motion." The "other relief" included a continuation of the second trial, but did not include allowing ACI to present the email attachments at the second trial.

ACI also asked the court to review the email attachments in camera. The district court indicated that it would not do so prior to the second trial; instead, it sealed the documents and stated that it would consider them after the second trial, if necessary.

### (b) ACI's Motion in Limine

In August 2015, ACI filed a motion for an order that the email attachments and Newsom's testimony about the email attachments were admissible in the second trial. A hearing was set for September 14 at 9 a.m. However, on appeal, there is no record of the hearing or the court's ruling on the motion.

### 6. Second Trial: BHMI's Counterclaims

The second trial on BHMI's counterclaims against ACI was held in mid-September 2015. Because ACI assigns that there was insufficient evidence to support BHMI's claims of breach of contract and violation of the Junkin Act, and because ACI assigns that there was "no cognizable evidence of damages to support any claim," we review the evidence presented on these issues in detail.

### (a) Evidence of Breach of NDA

Most of the evidence concerning BHMI's claims of breach of contract came from the testimony of Lynne Baldwin.

### (i) History of BHMI

Lynne testified that she and her husband, Jack Baldwin, formed BHMI in 1986, and in 1987, they were joined by Michael Meeks, who now serves as BHMI's vice president of development.

- 842 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

BHMI started as a custom software company that would write specific software from customer's specifications. Its customers included large transportation and communications corporations.

In the early 2000's, BHMI began to develop "Concourse Financial Software Suite" (Concourse), a software for companies that exchange transactions among different parties, referred to as "switches," such as companies that track when one bank's customer uses another bank's automated teller machine. Lynne explained that if a customer uses its "Bank A" debit card at "Bank B's" automated teller machine, Concourse can help switch companies route the transactions to "Bank A," so that "Bank B" will dispense cash to the customer, all the while keeping track of the amounts that different financial institutions owe each other for the service. Lynne testified that a number of switches have licensed Concourse, including a debit switch in Canada, the New York Cash Exchange, and "Pulse," the third largest debit switch in the United States.

### (ii) Development of TMS

According to Lynne, BHMI had a close, working relationship with HP. In April 2008, HP contacted BHMI to ask if it was interested in doing a project with MasterCard. BHMI indicated that it was. In April 2009, BHMI entered into an agreement with MasterCard to create a replacement for XPNET.

MasterCard and BHMI entered into a "Software License and Maintenance Agreement." Per the agreement, MasterCard agreed to pay BHMI $1.3 million to license TMS for 5 years.

Lynne testified that because of BHMI's development of Concourse, BHMI already had a certain level of TMS developed. Nevertheless, according to Lynne, TMS took "thousands of hours" and over a year to create. In August 2010, MasterCard accepted TMS, and BHMI then had a proprietary product that it could license and sell on the market.

### (iii) Marketing TMS

To advertise its new product, BHMI's marketing director, Casey Scheer, began a series of activities to market TMS, including adding a YouTube video about TMS on BHMI's website and releasing a press statement about TMS and how MasterCard was using it to replace XPNET. BHMI also hired a marketing consultant to tell them how large the market for TMS would be.

The marketing consultant advised BHMI that in order to market the software, it needed to secure as a customer a premier bank (as opposed to a switch like MasterCard) to show other banks that they could replace XPNET and the BASE24 system with TMS. Lynne explained that this would require finding a bank that was willing to create its own application around TMS, because "if you write any logical software that hooks into [XPNET or BASE24], ACI also owns that software even though [ACI] didn't write it, because that's the term of [its] contract."

### (iv) First National Bank of Omaha Expresses Interest in TMS

According to Lynne, after BHMI issued its press release, it started to get responses from customers around the globe. One such customer was First National Bank of Omaha (hereinafter FNBO), one of the largest credit card processing banks in the United States. A representative from FNBO emailed BHMI's marketing support person expressing interest in using TMS for its credit card processing. BHMI then met with FNBO to discuss replacing the BASE24 system with TMS.

Lynne testified that FNBO was not happy with XPNET, because it did not like ACI's transaction-based pricing. Under ACI's transaction-based pricing, customers like FNBO had to pay a certain amount per transaction in addition to the license and maintenance fees. Additionally, FNBO had financial concerns about the cost of transitioning to IBM hardware. Accordingly, BHMI started to negotiate with FNBO for the installation and licensing of TMS.

### (v) ACI Contacts BHMI

In early January 2011, 1 month after BHMI issued its press release, BHMI received a call from Dennis Byrnes, ACI's legal counsel. Byrnes requested a meeting, and Lynne met with him. Byrnes told Lynne that ACI's upper management and technical support personnel had heard about TMS and had concerns that it infringed on XPNET. Lynne responded that she "'didn't know how it could infringe on XPNET'" and explained to him that BHMI had used all of its own software to create TMS.

Byrnes told Lynne that ACI staff would like to talk to BHMI and have BHMI answer some questions. Lynne agreed to talk to ACI and answer general questions, but because ACI was now one of BHMI's competitors, BHMI asked that ACI sign a nondisclosure agreement and provide BHMI with a written list of questions ahead of time. ACI agreed. Lynne testified that Byrnes never said anything about filing a lawsuit; he wanted only to "allay the fears of [ACI's] upper management."

Lynne testified that when she received the nondisclosure agreement and list of questions from ACI, she was shocked by the list of questions. She explained that she expected the questions to be related to the marketing materials that BHMI had released. Instead, ACI asked "how [TMS] worked, how everything inside of it worked, what are your algorithms?" Lynne described these questions as "truly invasive," because they went to the "very essence of [BHMI's] intellectual property."

After receiving the nondisclosure agreement and questions, Lynne wrote a letter to Byrnes, stating, "With regard to the nondisclosure, BHMI does not see any language that would restrict ACI from using information about [TMS] in its own products. . . . Until we can mutually come to some agreement on the nondisclosure, we cannot provide any substantive information to ACI." Lynne also expressed to Byrnes that ACI's question about "'[i]dentify[ing] all interfaces providing XPNET compatibility'" made Lynne believe that ACI had incorrect information about TMS. Lynne explained to Byrnes that TMS is "'not compatible with XPNET since it provides

- 845 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

no interfaces with any part of XPNET,'" and "'a TMS node only communicates with other TMS nodes [and] cannot communicate with XPNET.'" Lynne suggested to Byrnes that perhaps with this new information, ACI might be assuaged and wish to withdraw its questions.

But ACI did not withdraw its questions, and instead continued to negotiate the NDA with BHMI. The final version of the NDA provided that ACI would not use any confidential information of BHMI's in a legal action against BHMI. The NDA provided, in relevant part:

1. **CONFIDENTIAL INFORMATION AND AUTHORIZED USE**

a. "**Confidential Information**" means all non-public information which [BHMI] furnishes to [ACI] . . . .

b. [ACI] wishes to receive [BHMI's] Confidential Information for the sole purpose of facilitating discussions between management of each party regarding information related to each party's proprietary products (the "**Authorized Use**"). . . .

c. Confidential Information shall not include any information that (i) is or subsequently becomes publicly available without [ACI's] breach of any obligation owed [BHMI], (ii) became known to [ACI] prior to [BHMI's] disclosure of such information to [ACI], (iii) became known to [ACI] from a source other than [BHMI] other than by breach of an obligation of confidentiality owed to [BHMI] or (iv) is independently developed by [ACI].

2. **RESTRICTIONS**

. . . .

c. Confidential Information may only be disclosed, reproduced, summarized or distributed (i) as strictly necessary for the Authorized Use, and (ii) only as otherwise provided hereunder. For the avoidance of doubt, [ACI] understands and agrees that in no event shall [ACI] utilize the Confidential Information of [BHMI] in any manner whatsoever (i) in the development of its respective products; . . . (iii) in any legal action directed toward

- 846 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

[BHMI] or its vendors, representatives, agents, or customers . . . .

After the NDA was executed by both parties, Lynne and Meeks met with Linberg and Hoss of ACI. Although Lynne expected that ACI would have some general questions about TMS, ACI again wanted to know how TMS, its routing algorithms, and its protocols all worked. According to Lynne, Linberg was very adamant about seeing BHMI's source code and manuals. Lynne testified that she and Meeks did not show Linberg or Hoss their source code or manuals and did not answer all of ACI's questions, and the meeting was adjourned.

Lynne then met with Byrnes to express her frustrations about the questions she received from ACI. The questions, she explained, were not what she and Byrnes agreed to. According to Lynne, Byrnes looked at the questions and said, "'Oh, I guess there's some mistake. I'll take it back,'" and then he left. Lynne testified that again Byrnes did not say anything about ACI's taking any legal action against BHMI.

BHMI held an internal meeting to discuss ACI's concerns, and it was decided that because BHMI "'ha[d] nothing to hide,'" maybe BHMI could let ACI "'look at a couple of manuals.'" Lynne testified that BHMI believed there was nothing in the manuals that would be a problem, so ACI could come over, look at the manuals, and then "'be happy.'"

On July 21, 2011, Linberg and Hoss came back to BHMI to look at the manuals. BHMI allowed Linberg and Hoss to look at the manuals in an office by themselves for as long as they wanted, but restricted them from making any copies. In addition, if Linberg and Hoss took any notes, BHMI wanted to be able to see what they had written before they left. Lynne believed that Linberg and Hoss spent "an hour and a half, maybe two hours" looking at the manuals.

After Linberg and Hoss finished looking at the manuals, they did not show Lynne any notes, and Lynne did not notice any. Linberg told Lynne that BHMI would hear from ACI within 2 weeks, but in the following months, BHMI did not hear anything from ACI.

### (vi) Development Agreement
### With FNBO

In the meantime, BHMI had entered into a development license agreement with FNBO for $125,000 per year. The development license allowed FNBO to start looking at how TMS worked so that it could develop and install its own hardware. The development license also contained all of the commercial terms to upgrade to a 5-year full operating license for $1.25 million, plus an 18-percent annual maintenance fee. Under the agreement, BHMI would receive a total of $1.525 million over 5 years. FNBO planned to "go live" with TMS in August 2012.

As part of the agreement, BHMI agreed to indemnify FNBO against any claims that its use of TMS violated a third-party's intellectual property rights. The agreement also required BHMI to let FNBO know if it believed that TMS was going to become the subject of an infringement claim. It also allowed FNBO to terminate the agreement and receive a full refund if TMS became the subject of an infringement claim. Lynne testified that these indemnification provisions were standard provisions in its agreements.

### (vii) ACI Sues BHMI

In March 2012, ACI notified BHMI of its intent to sue the company. According to Lynne, this was the first time that ACI had ever stated its intention "out loud."

Lynne testified that ACI's lawsuit threat was a "huge deal." She explained that a claim of infringement "is very serious in the marketplace" and that the "threat alone casts doubt on your capabilities, on how responsible you are as a company, and a lot of other areas."

Both ACI's chief executive officer and former HP executive Steven Saltwick testified that a company would not be able to license software that was alleged to be the product of infringement. Saltwick testified he would never even propose that an HP NonStop customer consider a software solution if there was a claim it had been misappropriated.

In response to ACI's lawsuit threat, BHMI told its marketing director to concentrate on marketing Concourse, instead of TMS. BHMI also disclosed ACI's threat to FNBO. FNBO wanted the TMS solution to work and told BHMI that it would work with BHMI as long as it could.

In July 2012, ACI and BHMI met again to discuss the issue, but no resolution was reached. Lynne testified that at the conclusion of the meeting, Linberg told BHMI that if it kept going forward with TMS, then ACI would sue BHMI and any customer that licensed TMS. Lynne testified that she could not in good faith market the software when ACI had threatened to sue anyone who licensed it.

Because the threat of litigation persisted, FNBO eventually terminated its license with BHMI and demanded a refund, which BHMI provided. Michael O'Neil, FNBO's vice president of technology, testified that "but for" ACI's lawsuit and threats, it would have entered into the 5-year production license for TMS under the terms to which the parties had already agreed and it would have renewed that license for an additional 5-year term.

At the trial, counsel for BHMI questioned Lynne, over ACI's objections, about all of the different claims ACI alleged against BHMI and against officers of BHMI in their personal capacity. Lynne was then asked about the first trial and whether BHMI "won on every one of [ACI's claims]." Over ACI's objection, Lynne testified that ACI did not win any of its claims.

### (b) Evidence Relating to
### Junkin Act Claim

BHMI also sought to prove that ACI had violated the Junkin Act by engaging in predatory or anticompetitive conduct to acquire or maintain its monopoly power. Its theory was that ACI sought to acquire or maintain monopoly power by asserting, without good faith, that TMS was the product of infringement so as to put a cloud over TMS and prevent BHMI from marketing it. Most of the evidence about the relevant market

and ACI's role within that market came from the testimony of Saltwick.

As part of his role at HP, Saltwick had been responsible for marketing HP NonStop hardware on a global basis and had worked with HP NonStop customers and advised them regarding software solutions. Because of this role, Saltwick was familiar with the worldwide market for retail financial payments software running on the HP NonStop platform. Of the 350 companies in this market, 300 of them used ACI's software.

### (c) Evidence Relating to Damages

Jack was the main witness to testify about BHMI's lost profits. BHMI does not use an outside public accounting firm; instead, Jack handles BHMI's finances, preparing documents such as BHMI's profit and loss statements, cashflow reports, and tax returns. To calculate BHMI's lost profits, Jack subtracted BHMI's estimated costs from its estimated revenue.

### (i) Estimated Costs

Jack testified that in his lost profits analysis, he accounted for certain estimated costs. Although BHMI did not accrue much in additional costs after it had already developed TMS for MasterCard, Jack explained BHMI would incur costs associated with the installation, consulting, and educating of customers as to how to use TMS. Jack estimated that these costs added up to about 160 hours of labor. But for purposes of his analysis, he "rounded up" to a "one-man month" of labor. To calculate the cost of a "one-man month" of labor, he used the $95,000 salary of an actual employee and added all the costs associated with the employee's employment, including unemployment insurance fees, family medical insurance premiums, and Social Security. Jack testified that BHMI paid a total of $121,000 per year to employ the employee. Dividing that cost by 12 for each month, Jack arrived at a cost of $10,113 per month for the employee's labor. This is the cost Jack attributed to each licensing agreement.

- 850 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

Jack testified that he did not account for BHMI's general overhead costs, because those costs would be incurred regardless of TMS. For example, BHMI's costs for rent, telephones, insurance, office supplies, and electricity would not have varied based on whether BHMI licensed TMS to additional customers. Jack also testified that if customers had a problem with TMS, they would call BHMI's general help desk, which BHMI paid to operate regardless of TMS. Because BHMI did not have a help desk dedicated to TMS, Jack did not attribute any costs to those calls. Jack testified that he considered the marketing costs for TMS, but explained that these costs were minimal, because marketing TMS typically consisted of Scheer's attending conferences to market all of BHMI's products, not just TMS.

### (ii) Net Lost Profits

#### a. FNBO

For the FNBO contract, Jack estimated that BHMI lost a total of $3,103,793.24 as a result of FNBO's backing out after ACI's lawsuit. For purposes of his lost profits analysis, Jack assumed that FNBO would have licensed TMS for 5 years and would have then renewed its license for another 5 years. As for the fees under a 5-year licensing agreement, Jack used the fees set forth in the development license, which shows a licensing fee of $1.25 million and a maintenance fee of $225,000. To calculate BHMI's lost profits in relation to the FNBO contract, Jack added the amount that BHMI refunded FNBO for the development license and professional fees ($163,906.24) to the amount in fees that FNBO would have paid under two 5-year licensing agreements ($2,950,000) for a total of $3,113,906.24. Jack then subtracted the costs associated with those agreements ($10,113) to reach a net profit of $3,103,793.24.

#### b. Other Lost Contracts

Jack also estimated lost profits incurred as a result of being unable to market TMS to other companies during the course

- 851 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

of the litigation. Jack assumed that BHMI would be able to secure two customers per year. This assumption was supported by Scheer's testimony that, based on the interest she received from the TMS marketing campaign, she felt "'very confident [BHMI could] close at least two contracts a year.'"

Jack also assumed that each company would renew their 5-year contracts for another 5-year term. This assumption was based on O'Neil's testimony that FNBO would have "continued with the [licensing] agreement another five years" and other testimony that installing TMS is a significant investment for a company.

To determine the fees that BHMI would have charged under the licensing agreements, Jack based the fees off the existing contracts with MasterCard and FNBO. Jack testified that BHMI had negotiated two different licensing fees for different pricing structures used by MasterCard and FNBO. Because Jack was unsure of which pricing structure most companies would want, Jack averaged the net profit that each structure would bring in his lost profits calculation.

Jack testified that because securing MasterCard and FNBO as customers would help BHMI secure other customers, BHMI offered MasterCard and FNBO discounted rates of one-third the retail price for those pricing structures. Rather than using the discounted rates, Jack used the retail prices to project the profit that BHMI would have generated if it had been able to enter into two 5-year license agreements per year for years 2012, 2013, and 2014. For these six licensing agreements, Jack projected that TMS would have generated $17,703,072 in net profit. Assuming each of those companies renewed for another 5-year licensing agreement, Jack projected a net profit of $35,016,822.

### 7. Conclusion of Second Trial

At the end of BHMI's case in chief and at the close of the evidence, ACI moved for a directed verdict on multiple grounds, including that BHMI failed to produce sufficient

- 852 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

evidence of its antitrust claims, damages, and causation. The district court denied ACI's motion.

The evidence was submitted to the jury, and the jury returned a verdict in favor of BHMI on all three claims, awarding damages of $43,806,362.70.

### 8. ATTORNEY FEES

Having prevailed on its Junkin Act claim, BHMI petitioned for attorney fees in the amount of $2,732,962.50 and costs in the amount of $7,657.93. In support of its petition, BHMI submitted the affidavit of Steven Davidson, the chair of a local law firm's litigation section, regarding the reasonableness of BHMI's fee application. Davidson reviewed a detailed summary of the work performed and concluded that both the numbers of hours expended and the hourly rates were reasonable. ACI did not offer any expert evidence rebutting Davidson's opinion.

The district court applied the factors set forth in our case law in determining the amount of a reasonable attorney fee. Well aware of the nature of the proceedings and the novelty and difficulty of the questions raised, the district court concluded that under the totality of the circumstances, the fee requested by BHMI was reasonable. Additional facts about the district court's reasoning are set forth in the analysis section below.

### 9. POSTTRIAL MOTIONS

After the second trial, ACI filed a number of motions, including a motion for remittitur, motions to vacate the judgments associated with the 2014 and 2015 trials, and motions for new trials. These motions were overruled.

### III. ASSIGNMENTS OF ERROR

ACI assigns, reordered and restated, that the district court erred (1) in overruling ACI's motions to dismiss BHMI's counterclaims because the *Noerr-Pennington* doctrine precludes BHMI's antitrust and tortious interference claims; (2) in overruling its motion to vacate the dismissal of ACI's claims

- 853 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

against BHMI on the basis of denied discovery; (3) in refusing to vacate the 2014 verdicts and associated judgment because ACI was denied discovery of BHMI trade secret information; and (4) in refusing to vacate the 2015 verdicts and associated judgment because (a) the *Noerr-Pennington* doctrine precludes BHMI's antitrust and tortious interference claims, (b) BHMI presented insufficient evidence to support any of its claims, (c) BHMI presented no cognizable evidence of damages to support any claim, (d) ACI was denied discovery of BHMI's trade secret information, and (e) the email attachments were erroneously excluded from evidence.

ACI further assigns that the district court abused its discretion in granting BHMI's application for attorney fees and costs.

## IV. STANDARD OF REVIEW

[1] An appellate court will reverse a decision on a motion to vacate or modify a judgment only if the litigant shows that the district court abused its discretion.[6]

[2] An appellate court reviews a trial court's ruling on a motion for a new trial for abuse of discretion.[7]

[3] Decisions regarding discovery are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion.[8]

[4,5] When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.[9] A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.[10]

---

[6] *Destiny 98 TD v. Miodowski*, 269 Neb. 427, 693 N.W.2d 278 (2005).

[7] *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

[8] *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016).

[9] See *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990).

[10] *Koster v. P & P Enters.*, 248 Neb. 759, 539 N.W.2d 274 (1995).

- 854 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

[6,7] Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.[11] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[12]

[8] When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion.[13]

## V. ANALYSIS

[9] We first note that a number of ACI's assignments of error and arguments will not be addressed on this appeal. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[14]

First, ACI assigned a number of errors that it failed to argue. ACI assigned that the district court erred in overruling both ACI's motions to dismiss BHMI's counterclaims and ACI's motions to vacate the dismissal of ACI's claims against BHMI. However, in its argument section, ACI failed to alert this court as to why ACI believes these rulings are in error. Not only were we unable to locate any reference to these motions in the body of ACI's brief, but we were unable to locate within the appellate record the district court's orders overruling these motions. For these reasons, we do not address the first two assignments of error.

---

[11] *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

[12] *Hartman v. Hartman*, 265 Neb. 515, 657 N.W.2d 646 (2003).

[13] *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011); *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009); *In re Estate of Chrisp*, 276 Neb. 966, 759 N.W.2d 87 (2009).

[14] *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015).

- 855 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

ACI also assigns that the 2015 judgment should be vacated, because BHMI failed to present sufficient evidence to support any of its counterclaims. However, ACI did not argue in its brief that BHMI failed to present sufficient evidence as to its tortious interference claim. Therefore, we only address the sufficiency of the evidence as to BHMI's Junkin Act and breach of contract claims.

Second, ACI argues that several of the court's rulings were in error, but failed to assign those rulings as error. For example, ACI argues that the district court erroneously allowed BHMI to "taint the jury" with (1) evidence that ACI lost the 2014 trial, (2) "the irrelevant fact" that ACI initially sued BHMI principals individually along with the company, and (3) evidence of the Department of Justice's second request for information.[15] Because ACI failed to assign these rulings as error, we do not consider them on appeal.

### 1. MOTION TO VACATE 2014 JUDGMENT

The first issue is whether the district court abused its discretion in overruling ACI's motion to vacate the 2014 judgment on the basis of denied discovery. In summary, ACI contends that the district court should have vacated the 2014 judgment and granted a new trial because it erroneously denied ACI access to BHMI's source code and manuals, thereby prohibiting ACI from presenting the evidence needed to prevail on its misappropriation claim.

Thus, in order to determine whether the district court abused its discretion in overruling ACI's motion to vacate the 2014 judgment, we must determine whether the district court erred in denying ACI's requested discovery. Decisions regarding discovery are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion.[16] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly

---

[15] Brief for appellant at 47.

[16] *Moreno v. City of Gering, supra* note 8.

- 856 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[17]

Parties are generally entitled to discovery regarding any nonprivileged matter that is relevant to any claim or defense.[18] However, under discovery rule § 6-326(c), the court has broad discretion to limit the time, place, and manner of discovery as required "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The court also has broad discretion to modify the timing and sequence of discovery "for the convenience of parties and witnesses and in the interests of justice."[19]

With regard to discovery of trade secret information, § 6-326(c)(7) specifically authorizes a trial court to enter a protective order requiring that "a trade secret . . . not be disclosed or be disclosed only in a designated way." It appears that we have not discussed this specific section as it relates to discovery of trade secret information, such as source code. But because § 6-326(c)(7) is modeled after Fed. R. Civ. P. 26(c)(1)(G), we look to the federal decisions for guidance.[20]

[10,11] A review of federal decisions governing trade secret discovery reveals that there is no talismanic procedure that may be used to obtain the best results in any given case.[21] Federal courts have taken different approaches, depending on the facts

---

[17] *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015); *Kercher v. Board of Regents*, 290 Neb. 428, 860 N.W.2d 398 (2015); *Richards v. McClure*, 290 Neb. 124, 858 N.W.2d 841 (2015); *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015); *Fox v. Whitbeck*, 286 Neb. 134, 835 N.W.2d 638 (2013).

[18] § 6-326(b)(1).

[19] § 6-326(d).

[20] See *Kellogg v. Nebraska Dept. of Corr. Servs.*, 269 Neb. 40, 690 N.W.2d 574 (2005).

[21] *Vesta Corp. v. Amdocs Management Ltd.*, 147 F. Supp. 3d 1147 (D. Or. 2015); *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676 (N.D. Ga. 2007); *Microwave Research Corp. v. Sanders Associates*, 110 F.R.D. 669 (D. Mass. 1986).

- 857 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

of a specific case.[22] In fact, one article on trade secret discovery identifies nine different approaches.[23] However, despite all the various approaches, an overarching theme emerges; i.e., the moving party's need for the trade secret information must be weighed against the injury that disclosure might cause the party opposing the discovery.[24] Here, the district court attempted to balance these competing interests by requiring ACI to first engage in non-trade-secret discovery to provide a factual basis for its claim before risking harm to BHMI's interest in TMS. This approach is commonly used by federal courts,[25] and we do not find it to be untenable in the context of this case.

---

[22] See Kevin R. Casey, *Identification of Trade Secrets During Discovery: Timing and Specificity*, 24 AIPLA Q.J. 191 (1996).

[23] *Id.*

[24] *In re Remington Arms Co., Inc.*, 952 F.2d 1029 (8th Cir. 1991); Casey, *supra* note 22.

[25] See, *Vesta Corp. v. Amdocs Management Ltd., supra* note 21, 147 F. Supp. 3d at 1154 (D. Or. 2015) ("[p]laintiff is required to identify the trade secrets it claims Defendants misappropriated with reasonable particularity before Defendants are required to produce their confidential information and trade secrets to Plaintiff in discovery"); *Puritan-Bennett Corp. v. Pruitt*, 142 F.R.D. 306, 308-09 (S.D. Iowa 1992) ("it is first incumbent upon [the plaintiff] to make a showing that there is a substantial basis for its claim"); *Microwave Research Corp. v. Sanders Associates, supra* note 21, 110 F.R.D. at 674 (D. Mass. 1986) (stating that "before a plaintiff is entitled to the type of broad discovery into a defendant's trade secrets, it must show that other evidence which it has gathered through discovery provides a substantial factual basis for its claim"); *Xerox Corp. v. International Business Machines Corp.*, 64 F.R.D. 367, 371-72 (S.D.N.Y. 1974) ("[a]t the very least, a defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are. Thus, after nearly a year of pre-trial discovery, [the plaintiff] should be able to identify in detail the trade secrets and confidential information alleged to have been misappropriated by [the defendant]"); *Storagecraft Technology Corp. v. Symantec Corp.*, No. 2:07cv856CW, 2009 WL 361282 at *2 (D. Utah Feb. 11, 2009) (unpublished opinion) ("regardless of the approach, it is apparent that '[t]he reasonable particularity standard requires that the alleged trade secret be described "with adequate specificity to inform the defendants what it is alleged to have misappropriated"'").

- 858 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

The course of discovery leading up to the first trial is perhaps best summarized in the district court's order overruling ACI's motion to continue the first trial:

The Court has held numerous discovery hearings as well as hearings on the Motion for Summary Judgment.

With regard to discovery, particularly [ACI's] efforts to obtain BHMI's source code, the Court has repeatedly urged the parties to engage in discovery in order to determine whether there exists sufficient evidence to order the disclosure of BHMI's source code. The Court has repeatedly told the parties that it would strongly consider some type of disclosure of BHMI's source code provided something more than "strong suspicions" is used to support the disclosure. . . .

. . . .

Though this case was filed in September, 2012, no depositions were taken at all in this case until May, 2013 when [ACI's] representative, . . . Linberg, was deposed. As of this writing in late June, 2014, so far as the Court can tell, only 4 other depositions have been taken—those of [d]efendants . . . Meeks, Karen Furst-Meeks, Jack . . . and MasterCard representative . . . Birge.

Since the Court's July 26, 2013 Order on discovery, the only significant evidence presented to the Court by [ACI] as to possible plagiarism is the affidavit of [ACI's] employee, . . . Newsom. In . . . Newsom's affidavit (Ex. 33) he states that he reviewed the emails transmitting information from MasterCard to BHMI (Deposition exhibits 24C-D, 25, 26-A-C, 27A-M, 32, 37, 38, 41,49,50, 52, 55, 69, 73,74) which reference attachments or materials by name or description and concludes: "30. Based on my review of the documents detailed above, it is my strongly held opinion that some of the materials and documents provided by MasterCard to BHMI were never in the MDS source code or configurations files. The only source for these materials and documents are ACI's [intellectual property]."

- 859 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

The emails referenced by . . . Newsom are from and between some of the following individuals at MasterCard: Larry Kjellberg, Glenn Leach, John Lovgren, Tom Wolak, . . . LaRosa, [Hall], George Spies, Diane Dobleske, Mike Obeidi, James Perkins and Ken Vagt—none of these people have been deposed to find out what they actually sent, received or attached to the correspondence.

[ACI] has repeatedly argued that . . . BHMI made references to [MasterCard regarding] the intent and need for MasterCard to produce XPNET materials to BHMI so that it could develop TMS and that representations have been made that XPNET and TMS are compatible or can interface. One of the individuals that [ACI] believes asked for such materials or made statements about compatibility with XPNET, is . . . Lynne . . . yet she has never been deposed to see if she even received such materials or why she may have made such representations. . . .

. . . .

. . . The Court believes that its approach to discovery in this case is also quite orthodox and [ACI] has resisted to this point the Court's encouragement to engage in vigorous non trade secret discovery in preference to its own method of discovery knowing that the trial date was approaching. The Court notes that according to counsel for [BHMI] and MasterCard, their clients have disclosed some 5,000 and 19,000 pages of documents, respectively, to [ACI] during the course of this case. It is not as if this Court has set an insurmountable bar to further discovery.

To be absolutely clear, the Court has never taken the position that [ACI] could not have access to the source codes under any circumstances. The Court has simply asked for evidence to be produced that supports a certain level of probability that plagiarism occurred before triggering the disclosure of the source code and related materials.

Given that ACI conducted little non-trade-secret discovery, its need for trade secret discovery was much less than it would have been had it exhausted all of its non-trade-secret resources. In contrast, BHMI's need to protect its trade secrets from ACI was high, given that ACI is BHMI's competitor and could incorporate BHMI's trade secrets into its own products. Accordingly, we conclude that the district court did not abuse its discretion in overruling ACI's motions to compel production of BHMI's trade secrets, nor did it abuse its discretion in overruling ACI's motion to vacate the 2014 judgment. Therefore, this assignment of error is without merit.

## 2. ACI's MOTION TO VACATE 2015 JUDGMENT

The next issue is whether the district court abused its discretion in overruling ACI's motions to vacate the 2015 judgment for any of the following reasons: (a) the *Noerr-Pennington* doctrine precludes BHMI's antitrust and tortious interference claims, (b) BHMI presented insufficient evidence to support its antitrust and breach of contract claims, (c) BHMI presented no cognizable evidence of damages to support any claim, (d) ACI was denied discovery of BHMI's trade secret information, and (e) the email attachments were erroneously excluded from evidence. We address each of these proposed reasons in turn.

### (a) *Noerr-Pennington* Doctrine

First, ACI argues that the 2015 judgment should have been vacated because BHMI's antitrust and tortious interference claims were precluded by the *Noerr-Pennington* doctrine. BHMI argues that *Noerr-Pennington* does not apply to those claims and that even if it did, ACI waived the protection of *Noerr-Pennington* by failing to raise it as an affirmative defense. Before addressing whether ACI waived the protection of *Noerr-Pennington*, we first set forth the principle known as the *Noerr-Pennington* doctrine.

[12] Under the *Noerr-Pennington* doctrine, a party is protected from tort liability for the act of filing a lawsuit.[26] This doctrine was named after the two U.S. Supreme Court cases from which it originated: *Eastern R. Conf. v. Noerr Motors*[27] and *Mine Workers v. Pennington*.[28] Originally, the doctrine exempted *from antitrust laws* certain petitioning of the courts and administrative agencies that resulted in anticompetitive effects.[29] However, the doctrine was later extended to provide a defense to other kinds of claims where the filing of a lawsuit is identified as the wrongful conduct, such as a claim of malicious prosecution or tortious interference with a business relationship.[30]

[13] No matter the context, however, *Noerr-Pennington* does not protect a party from liability for the act of filing a "sham" lawsuit.[31] A lawsuit is a "sham" if it is both (1) objectively baseless in the sense that no reasonable litigant could expect success on the merits and (2) subjectively motivated by bad faith.[32]

---

[26] *International Motor Contest Ass'n, Inc. v. Staley*, 434 F. Supp. 2d 650 (N.D. Iowa 2006) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077 (8th Cir. 1999); *Eastern R. Conf. v. Noerr Motors, supra* note 5; and *Mine Workers v. Pennington, supra* note 5).

[27] *Eastern R. Conf. v. Noerr Motors, supra* note 5.

[28] *Mine Workers v. Pennington, supra* note 5.

[29] *International Motor Contest Ass'n, Inc. v. Staley, supra* note 26.

[30] *Id.* (citing *State of S.D. v. Kansas City Southern Industries*, 880 F.2d 40 (8th Cir. 1989), and *Hufsmith v. Weaver*, 817 F.2d 455 (8th Cir. 1987)). See *IGEN Intern., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303 (4th Cir. 2003).

[31] *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 61, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993).

[32] *International Motor Contest Ass'n, Inc. v. Staley, supra* note 26 (citing *Porous Media Corp. v. Pall Corp., supra* note 26, and *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., supra* note 31).

We now turn to consider whether ACI waived any protection *Noerr-Pennington* may have provided by failing to reference it in its answer to BHMI's second amended counterclaim. Because an affirmative defense must be pleaded to be considered at the trial court level and on appeal,[33] the issue is whether the *Noerr-Pennington* doctrine is an affirmative defense.

ACI argues that *Noerr-Pennington* is not an affirmative defense and that BHMI "has the burden to prove that immunity does not attach to the challenged activity."[34] In support of its argument, ACI cites a footnote from the 11th Circuit's opinion in *McGuire Oil Co. v. Mapco, Inc.*[35] The footnote states, "Under the Sherman Act, *Noerr-Pennington* immunity is not merely an affirmative defense. Rather, 'the antitrust plaintiff has the burden of establishing that the defendant restrained trade unreasonably, which cannot be done when the restraining action is that of the government.'"[36] We do not read this statement to mean that *Noerr-Pennington* is not an affirmative defense; instead, we read it to mean that *although Noerr-Pennington* is an affirmative defense, the antitrust plaintiff still has the burden to prove the elements of an antitrust case. In other words, the statement dealt with burdens of proof and not with the status of *Noerr-Pennington* as an affirmative defense.

In contrast to ACI's contention, the Fourth and Fifth Circuits, as well as several state appellate courts, have all held that the *Noerr-Pennington* doctrine is an affirmative

---

[33] Neb. Ct. R. Pldg. § 6-1108(c). See *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

[34] Reply brief for appellant at 1.

[35] *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552 (11th Cir. 1992).

[36] *Id.* at 1558 n.9 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, An Analysis of Antitrust Principles and Their Application § 203.4c (Supp. 1990)).

- 863 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

defense.[37] The Fifth Circuit held, for example, that "the *Noerr-Pennington* doctrine should be raised as an affirmative defense" and explained that generally, "a party's failure to raise an affirmative defense in its first responsive pleading results in waiver."[38] We agree with these courts.

[14,15] An affirmative defense raises new matters which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.[39] Here, ACI's claim of *Noerr-Pennington* immunity raised a new matter, which if established, would constitute a defense to the merits of, at least, BHMI's antitrust counterclaim. Accordingly, the *Noerr-Pennington* defense is an affirmative defense.

Nevertheless, ACI contends that even if *Noerr-Pennington* is an affirmative defense, its failure to raise that defense in the pleadings did not constitute waiver for two reasons. First, ACI contends that the failure to plead the *Noerr-Pennington* defense does not result in waiver because "[c]onstitutional rights are presumed not to be waived," and *Noerr-Pennington* is rooted in the First Amendment's right to petition the government.[40] We find this argument unpersuasive, however, because other affirmative defenses that are rooted in the Constitution are waived if not pled. For example, "truth" is an affirmative defense in a defamation action, and despite the fact that it is

---

[37] See, *Waugh Chapel South v. United Food and Commercial*, 728 F.3d 354 (4th Cir. 2013); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852 (5th Cir. 2000); *Lanzer v. Louisville*, 2016 Ohio 8071, ___ N.E.3d ___ (2016); *Bauldau v. Jonkers*, 229 W. Va. 1, 725 S.E.2d 170 (2011); *Astoria Entertainment, Inc. v. Debartolo*, 12 So. 3d 956 (La. 2009); *RRR Farms, Ltd v. American Horse Protection*, 957 S.W.2d 121 (Tex. App. 1997). Contra *Las Vegas Sands v. Culinary Local # 226*, 82 Fed. Appx. 580, 585 (9th Cir. 2003) ("[f]or a plaintiff to succeed in invoking the sham exception to defeat *Noerr-Pennington* immunity, a plaintiff must plead with specificity the 'sham-ful' nature of the alleged interference").

[38] *Bayou Fleet, Inc. v. Alexander, supra* note 37, 234 F.3d at 860.

[39] See *Funk v. Lincoln-Lancaster Cty. Crime Stoppers, supra* note 33.

[40] Reply brief for appellant at 1.

rooted in the First Amendment,[41] it is waived if not pled.[42] Additionally, we have held that sovereign immunity, which is rooted in the 11th Amendment,[43] is an affirmative defense that is waived if not pled.[44]

Second, ACI suggests that we should adopt the rule set forth in *Bayou Fleet, Inc. v. Alexander*[45] that an "affirmative defense is not waived if it is raised at a 'pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond.'" However, even if we adopted such a rule, we find that ACI did not raise the *Noerr-Pennington* defense at a pragmatically sufficient time. In *Bayou Fleet, Inc.*, the motion for summary judgment setting forth the defense of the *Noerr-Pennington* doctrine had been filed 1 year before trial. Here, ACI did not mention the *Noerr-Pennington* defense until the summary judgment hearing on July 31, 2015, which occurred less than 2 months prior to the second trial and nearly 3 years after the case began. And ACI did not attempt to amend its pleadings to add the defense at that time.

Although prejudice to the plaintiff may be avoided in some cases by a continuation of trial, such was not the case here. Importantly, both parties in this case requested expedited discovery, and at multiple hearings, BHMI expressed that the litigation was having a negative effect on its ability to market TMS and that continuation of the trial was not a favorable option. The court also indicated that it was unwilling to continue trial. In light of these facts, we conclude that even if we

---

[41] See *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975) ("the defense of truth is constitutionally required where the subject of the publication is a public official or public figure").

[42] *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990).

[43] See *Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010).

[44] *Fuhrman v. State*, 265 Neb. 176, 182, 655 N.W.2d 866, 873 (2003) ("sovereign and qualified immunity are affirmative defenses which should be affirmatively pleaded or are considered waived").

[45] *Bayou Fleet, Inc. v. Alexander, supra* note 37, 234 F.3d at 860.

- 865 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

adopted an exception to the rule that affirmative defenses are required to be plead, such exception would not apply here.

We note that on September 11, 2015, 3 days before the second trial, ACI filed a motion requesting leave to file an amended answer to add the *Noerr-Pennington* defense. Because ACI took the position that *Noerr-Pennington* was not an affirmative defense, the district court overruled the motion, reasoning that the pleadings need only set forth affirmative defenses. Because ACI did not assign or argue that this ruling was in error, we do not address on appeal whether the district court erred in overruling ACI's motion to amend its pleadings.[46]

Because we find that ACI waived the *Noerr-Pennington* defense by failing to raise it as an affirmative defense, the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment for this reason.

### (b) Sufficiency of Evidence

ACI next assigns that the 2015 judgment should have been vacated, because BHMI did not present sufficient evidence to support the jury's verdict on the Junkin Act and breach of contract claims. When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.[47] A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.[48]

### (i) Junkin Act

We first consider the sufficiency of the evidence to support BHMI's Junkin Act claim. The Junkin Act makes it illegal to "monopolize, or attempt to monopolize, or combine or

---

[46] *In re Claims Against Pierce Elevator, supra* note 14.

[47] *Chadron Energy Corp. v. First Nat. Bank, supra* note 9.

[48] *Koster v. P & P Enters., supra* note 10.

- 866 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

conspire with any other person or persons, to monopolize any part of the trade or commerce."[49] The Junkin Act allows "[a]ny person who is injured in his or her business or property" by a violation of the Junkin Act to recover damages and costs of suit, including a reasonable attorney fees.[50]

[16,17] For purposes of the Junkin Act, monopolization consists of two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.[51] The existence of monopoly power ordinarily is inferred from the seller's possession of a predominant share of the market.[52]

[18-20] Despite the broad remedial language of the Junkin Act, not every person claiming an injury from a Junkin Act violation can recover damages.[53] To recover damages, a plaintiff must prove an antitrust injury.[54] To constitute an antitrust injury, the injury must reflect the anticompetitive effect of the violation or the anticompetitive effects of anti-competitive acts made possible by the violation.[55] As noted by the 11th Circuit in *Jacobs v. Tempur-Pedic Intern., Inc.*,[56] "Actual anticompetitive effects include, but are not limited

---

[49] § 59-802.

[50] § 59-821.

[51] *Health Consultants v. Precision Instruments*, 247 Neb. 267, 527 N.W.2d 596 (1995) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)).

[52] *Eastman Kodak Co. v. Image Technical Services, Inc., supra* note 51.

[53] See *Kanne v. Visa U.S.A.*, 272 Neb. 489, 723 N.W.2d 293 (2006).

[54] See, § 59-821; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).

[55] *Id.*

[56] *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010).

to, reduction of output, increase in price, or deterioration in quality."

With respect to BHMI's Junkin Act claim, ACI argues only that there was insufficient evidence of an "antitrust injury"; it does not argue that there was insufficient evidence to establish any other element of BHMI's Junkin Act claim.

ACI argues that BHMI did not present evidence of an antitrust injury because it did not show any anticompetitive effects of ACI's Junkin Act violation. In support of that argument, ACI cites *Cobb Theatres III v. AMC Entertainment Holdings*,[57] for the proposition that to support an award of damages, "competition must be shown not through harm to the plaintiff, but though market-wide impact such as increased prices, reduced output, or reduced product quality resulting from the defendant's conduct."[58] ACI argues that BHMI failed to prove increased prices, reduced output, or reduced product quality; therefore, ACI claims, BHMI has not shown an antitrust injury.

Although we note that the court in *Cobb Theatres III* did not limit evidence of an antitrust injury to those three factors,[59] we conclude that BHMI did submit evidence of those factors. For example, BHMI presented evidence of a reduced output and an increased price when it showed that, by keeping TMS out of the market, ACI deprived consumers and the market of a more affordable option. In fact, multiple witnesses testified that TMS could not be marketed because of ACI's lawsuit, and

---

[57] *Cobb Theatres III v. AMC Entertainment Holdings*, 101 F. Supp. 3d 1319 (N.D. Ga. 2015).

[58] Brief for appellant at 34.

[59] See *Cobb Theatres III v. AMC Entertainment Holdings, supra* note 57 (quoting *Jacobs v. Tempur-Pedic Intern., Inc., supra* note 56, 626 F.3d at 1339, for proposition that "[a]ctual anticompetitive effects include, *but are not limited to*, reduction of output, increase in price, or deterioration in quality" (emphasis supplied)).

- 868 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

O'Neil testified that TMS was approximately half the price of XPNET. BHMI also presented evidence of reduced product quality. Specifically, BHMI presented evidence that TMS was capable of running on multiple platforms, while XPNET could run only on HP NonStop hardware. Thus, the jury could infer that the market was deprived of higher quality software with additional features.

Based on the evidence set forth above, we conclude that BHMI presented competent evidence upon which the jury could find that BHMI sustained an antitrust injury. Therefore, the jury was not clearly wrong in finding in favor of BHMI on its Junkin Act claim, and the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment for this reason.

### (ii) Breach of Contract

ACI also claims that BHMI presented insufficient evidence to support the jury's finding that ACI violated the NDA. In this regard, ACI sets forth two arguments. First, ACI contends that because the NDA protected only "non-public information," ACI could not have breached the agreement, because the allegations in ACI's complaint are public.[60] Second, ACI suggests that the jury misinterpreted the NDA to be a "'never sue agreement.'"[61] We address both of these arguments in turn and find neither to have any merit.

[21,22] The interpretation of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[62] When the terms of a contract are clear, they are to be accorded their plain and ordinary

---

[60] Brief for appellant at 33.

[61] Id.

[62] *Fitzgerald v. Community Redevelopment Corp.*, 283 Neb. 428, 811 N.W.2d 178 (2012).

- 869 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

meaning.[63] As noted above, paragraph 2(c) of the NDA provides, in relevant part: "For the avoidance of doubt, [ACI] understands and agrees that in no event shall [ACI] utilize the Confidential Information of [BHMI] *in any manner whatsoever* . . . (iii) in any legal action directed toward [BHMI] or its vendors, representatives, agents, or customers . . . ." (Emphasis supplied.)

The terms of the NDA are clear: ACI was not to use BHMI's confidential information "in any manner whatsoever," including to form the basis of ACI's lawsuit against BHMI. In ACI's complaint against BHMI, ACI alleged that "BHMI agreed to allow ACI representatives to conduct an examination of the operations, configurations, and application programming manuals related to [TMS]" and that "[a]s a result of the inspection, ACI found a high degree of conceptual similarity . . . ."

Although ACI did not disclose the specifics of the confidential information within the complaint, the NDA did not prohibit ACI from merely *disclosing* the information; it prohibited ACI from *utilizing* the information *in any manner whatsoever*, including in a legal action directed toward BHMI or its customers. Based on these allegations, we conclude that the jury did not commit clear error in finding that ACI utilized BHMI's confidential information to form the basis of its lawsuit in direct violation of the NDA.

Turning to ACI's second argument, we disagree that the NDA was misinterpreted as a "never sue agreement." The language of the NDA does not preclude a legal action against BHMI. It simply precluded ACI from using in a legal action the information that BHMI provided to it during the course of

---

[63] *Pavers, Inc. v. Board of Regents*, 276 Neb. 559, 755 N.W.2d 400 (2008); *Katherine R. Napleton Trust v. Vatterott Ed. Ctrs.*, 275 Neb. 182, 745 N.W.2d 325 (2008); *Sayah v. Metropolitan Prop. & Cas. Ins. Co.*, 273 Neb. 744, 733 N.W.2d 192 (2007).

- 870 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

the meetings. The same information could have been obtained and used against BHMI through proper methods such as traditional discovery.

Accordingly, we find sufficient competent evidence to support the jury verdict that ACI violated the NDA. Therefore, the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment for this reason.

### (c) Evidence of Damages

ACI next assigns that the district court erred in overruling its motion to vacate the 2015 judgment, because BHMI presented "no cognizable evidence of damages to support any claim." In this regard, ACI sets forth two arguments. First, ACI argues that Jack's opinion about BHMI's lost profits should not have been admitted because he was not qualified to testify as an expert. Second, ACI argues that even if Jack was qualified to testify, the evidence he presented was insufficient to support the jury's award of $43,806,362.70. We address each of these arguments in turn and find neither to have any merit.

### (i) Jack's Qualification as Expert Witness

Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.[64] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[65]

An expert's opinion is ordinarily admissible under Neb. Rev. Stat. § 27-702 (Reissue 2016) if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact,

[64] *Robb v. Robb, supra* note 11.

[65] *Hartman v. Hartman, supra* note 12.

- 871 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

(3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination.[66]

ACI argues that the district court erred in finding that Jack was qualified to testify about BHMI's future lost profits, because Jack was not formally trained in performing a lost profits analysis and did not have an accounting degree.

[23-25] However, there is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.[67] Experts or skilled witnesses will be considered qualified if they possess special skill or knowledge respecting the subject matter involved superior to that of persons in general, so as to make the expert's formation of a judgment a fact of probative value.[68] And a witness may qualify as an expert by virtue of either formal training or actual practical experience in the field.[69]

As BHMI points out, we have previously allowed principals of businesses to opine regarding lost profits suffered by their businesses. For example, we found that the owner of farmland had sufficient basis to opine on lost profits resulting from a decrease in crop yields,[70] that a principal stockholder of a manufacturing business was qualified to testify about lost profits of that business,[71] and that the owner of a distributorship was qualified to testify regarding lost profits suffered by his business.[72] Although we allowed owners to testify on lost

---

[66] *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004).

[67] *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009).

[68] *Id.*

[69] *Id.*

[70] *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012).

[71] *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.*, 204 Neb. 248, 281 N.W.2d 778 (1979).

[72] *Diesel Service, Inc. v. Accessory Sales, Inc.*, 210 Neb. 797, 317 N.W.2d 719 (1982).

- 872 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

profits, we note that in each case, it was the practical experience of the owner as it relates to that particular business which established the foundation for the opinion, not just ownership. The same is true here.

Jack's knowledge about BHMI's lost profits is clearly superior to that of persons in general. Jack handles all of BHMI's finances and has had 30 years' practical experience running BHMI. Jack is knowledgeable about the costs incurred to develop and license TMS. He is aware of BHMI's current and potential customers and the prices BHMI charges for its licensing. For these reasons, we find the district court did not commit clear error in finding that Jack was qualified to testify, did not abuse its discretion in allowing Jack to opine on BHMI's lost profits, and did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment due to the qualifications of Jack.

### (ii) Sufficiency of Damages Evidence

ACI also contends that BHMI's damages evidence was insufficient, because Jack failed to account for certain costs in his future lost profits calculation and because BHMI failed to offer business records to support his calculation.

[26] A plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural, but proof of damages to a mathematical certainty is not required; the proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness.[73]

### a. Costs

ACI argues that BHMI's damages evidence was insufficient, because Jack failed to take into account (1) costs of developing new versions of TMS, (2) maintenance costs, and (3) general overhead costs.

---

[73] *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003).

- 873 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

As for costs of developing new versions of TMS, ACI asserts that Jack "admitted that, although BHMI would expect to release subsequent versions of TMS during the twelve-year period of his damages model, his model did not include the costs of developing those new versions."[74] However, Jack's testimony in this regard is as follows:

> Q. . . . [T]here certainly would have been new versions developed of TMS over a 12-year period? Can we agree with that?
>
> A. No, sir, I don't necessarily agree with that.
>
> Q. All right. So software companies don't routinely come up with version 1.0 and 1.2? That would never happen with your software, right?
>
> . . . .
>
> A. They may or may not, sir.
>
> Q. But you didn't figure that in. You just figured for 12 straight years TMS — there would be no new versions whatsoever, correct?
>
> A. I extrapolated costs and revenue based on what we had seen and what I knew.
>
> Q. That's not my question. You said you did not believe that there would be any new versions over a 12-year period for TMS, correct?
>
> A. I'm not sure I said that. I'm saying that I don't know, but there may or may not be.

Whether or not new versions of TMS would have been developed is a question of fact for the jury. Resolving this evidentiary conflict in favor of BHMI, we conclude that it would be speculative to attribute costs to the development of new versions of TMS, because it is unknown whether new versions of TMS would be released.

We turn now to the "maintenance costs" and "general overhead costs" which ACI asserts BHMI was required to account

---

[74] Brief for appellant at 39.

- 874 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

for but failed to do so.[75] To support its assertion that Jack failed to account for "maintenance costs," ACI points to the following testimony:

Q. Isn't there a cost to your company to provide the maintenance?

A. Not really. Not in the case of TMS. We have not seen that cost. For example, if people call and say, "I've got a problem" or "I need to do something," we don't have a separate help desk facility. Certainly not one that's dedicated to TMS.

Essentially, if somebody calls in for any reason for any of our products, we will assign the question or the issue or the problem to one of our staff members who's doing that along with other duties. So essentially that is what is considered to be a fixed cost to deal with those kinds of issues. So it's not really a cost that comes out of our pocket as such because we're already paying that individual for doing that kind of work plus others. So it's not a particular cost allocated specifically against TMS.

[27] Based on Jack's testimony, it is clear that the above "maintenance costs" are overhead costs. Overhead costs are business expenses that cannot be allocated to a particular service or product.[76] BHMI's cost of employees to run the help desk is an overhead cost because it cannot be allocated specifically to TMS or any other product or service. Accordingly, ACI's arguments about "maintenance costs" and "general overhead costs" run together and present the same issue.

In support of ACI's argument that Jack should have taken BHMI's general overhead costs into account, ACI cites *Home Pride Foods v. Johnson*.[77] ACI argues that this case shows

---

[75] *Id.*

[76] Black's Law Dictionary 1278 (10th ed. 2014). See, also, 177 Neb. Admin. Code, ch. 5, § 003 (2006).

[77] *Home Pride Foods v. Johnson*, 262 Neb. 701, 634 N.W.2d 774 (2001).

- 875 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

that Nebraska law requires that overhead costs be taken into account in lost profits analyses. However, we do not find such a requirement in our reading of *Home Pride Foods*.

In *Home Pride Foods*, we held that a plaintiff has not presented sufficient evidence of lost profits where he or she presents only evidence of gross profits and does not present evidence of *any* costs. In that case, the plaintiff had not presented any evidence of any costs, including overhead costs. But we never held that the plaintiff was required to subtract overhead costs from its revenue in calculating its lost profits. Instead, we concluded that the plaintiff failed to present sufficient evidence to support an award of damages, because only net profits are recoverable, and that the plaintiff's net profits could not be calculated where there was no evidence of costs.

Contrary to ACI's argument on appeal, "'[t]he weight of authority holds that fixed overhead expenses need not be deducted from gross income to arrive at the net profit properly recoverable.'"[78] This rule has been explained:

> "The true rule seems to be that the prospective profits should be diminished by charges composing an essential element in the cost to manufacture . . . . Essential elements in such cost do not include remote costs, overhead or otherwise, but are confined to expenditures that would necessarily have been made in the performance of the contract. The only matter of concern is the detriment suffered or benefit lost as a result of the breach. If the fixed expenses neither increased nor decreased as a consequence of the nonperformance of the contract, there would be no loss or benefit arising from that factor."[79]

---

[78] *Vanwyk Textile Systems v. Zimmer Mach. Amer., Inc.*, 994 F. Supp. 350, 383 (W.D.N.C. 1997).

[79] 1 Robert L. Dunn, Recovery of Damages for Lost Profits § 6.5 at 487-88 (6th ed. 2005) (quoting *Oakland Cal. Towel Co. v. Sivils*, 52 Cal. App. 2d 517, 126 P.2d 651 (1942)). Accord *Vanwyk Textile Systems v. Zimmer Mach. Amer., Inc., supra* note 78.

Here, consistent with the rule in *Home Pride Foods*, BHMI presented evidence of its lost net profits by presenting evidence of lost revenue and evidence of the expenses attributable to TMS. We therefore conclude that BHMI presented sufficient evidence upon which the jury could reasonably estimate BHMI's lost net profits.

### b. Supporting Financial Data

ACI also argues that BHMI's evidence of damages was insufficient because BHMI "failed to offer any quantifiable business records (income tax return, proft/loss statements or business records) to support its future lost profits calculation."[80]

In support of its argument, ACI cites *Evergreen Farms v. First Nat. Bank & Trust*[81] and *World Radio Labs. v. Coopers & Lybrand*.[82] In *Evergreen Farms*, we held that a claim for lost profits must be supported by "some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness."[83] In that case, we found that the plaintiff had not submitted sufficient evidence to sustain the jury's award of damages where the only evidence of damages was the testimony of one of the partners of Evergreen Farms (Evergreen). In calculating Evergreen's lost profits, the partner assumed that Evergreen would be paid to feed an additional 2,000 head of cattle at a rate of 10 cents per head. Not only were these numbers not supported by any of Evergreen's financial documents, but the numbers were not based on any reliable evidence. The partner provided no basis for his assumption that Evergreen would have made 10 cents

---

[80] Brief for appellant at 38.

[81] *Evergreen Farms v. First Nat. Bank & Trust*, 250 Neb. 860, 553 N.W.2d 728 (1996).

[82] *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996).

[83] *Evergreen Farms v. First Nat. Bank & Trust, supra* note 81, 250 Neb. at 868, 553 N.W.2d at 734.

- 877 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

per head of cattle, and the partner's assumption that Evergreen would have had an additional 2,000 head of cattle was based on "the fact that Evergreen was feeding 3,500 to 4,000 head of cattle and 'all of a sudden we dropped down to from 1,500 to 2,000 for two years.'"[84] Because we determined that this evidence was too speculative and conjectural, we held that Evergreen's damages evidence was insufficient to support the jury's award.

In *World Radio Labs.*, we also found that the damages evidence was insufficient. In that case, the plaintiff's chief financial officer estimated lost profits by assuming that the plaintiff would have made the same amount of profit that it did during another time period. We concluded that the chief financial officer's testimony was too speculative and conjectural because his estimation "failed to account for the many differences in the business between [the] time periods [being compared]."[85]

Even if we interpreted these two cases, as ACI urges, to require a plaintiff to submit business records to support its claim for lost profits, we conclude that BHMI did submit business records to support its claim. The prices Jack used in his lost profits analysis were based on actual contracts that he negotiated with MasterCard and FNBO for BHMI, which were received into evidence.

We further note that Jack's lost profits analysis was not solely supported by his own testimony, but also by the testimony of Scheer and Saltwick. Scheer testified that given the level of interest expressed by target customers, it was reasonable for BHMI to expect to license TMS to two customers per year. Saltwick testified that he agreed there was "significant market demand for solutions . . . to replace ACI software." In a market of 300 customers, a "significant market demand"

---

[84] *Id.* at 867, 553 N.W.2d at 734.

[85] *World Radio Labs. v. Coopers & Lybrand, supra* note 82, 251 Neb. at 281, 557 N.W.2d at 13.

- 878 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

would surely encompass two customers per year, which is less than 1 percent of the market.

For the foregoing reasons, we conclude that BHMI presented sufficient evidence to allow the jury to estimate actual damages with a reasonable degree of certainty and exactness. We therefore find that the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment for this reason.

### (d) Denied Discovery

ACI next assigns that the district court erred in overruling its motion to vacate the 2015 judgment because ACI was denied discovery of BHMI's trade secrets. We have previously addressed this issue with regard to the 2014 judgment. A review of the record reveals that after the first trial and before the second trial, ACI never filed a motion to compel the discovery of BHMI's trade secrets. Thus, for the same reasons set forth in the section on the 2014 judgment, we conclude that the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment.

### (e) Exclusion of Email Attachments

Next, ACI assigns that the district court erred in overruling its motion to vacate the 2015 judgment because it excluded evidence that would allow ACI to show that it filed the original lawsuit with good faith. The only evidence that ACI argues was improperly excluded was the evidence that ACI obtained in the federal litigation and evidence that ACI survived motions to dismiss and motions for summary judgment.

[28,29] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is a factor only when the rules make such discretion a factor in determining admissibility.[86] To constitute reversible error in a civil case,

---

[86] *Nickell v. Russell*, 260 Neb. 1, 614 N.W.2d 349 (2000).

- 879 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

the admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about evidence admitted or excluded.[87]

We first address ACI's claim that the district court erroneously excluded the evidence obtained in the federal litigation. After reviewing the record, we conclude that the district court did not make a ruling on the admissibility of such evidence because that evidence was never offered during the trial. The record reflects that at a hearing on July 31, 2015, ACI first offered exhibit 314, which was the emails and attachments obtained in the federal litigation, in support of its motion to vacate the 2014 judgment.

On August 26, 2015, ACI filed a motion requesting that the court rule on the admissibility of exhibit 314 for purposes of the second trial, and it set the motion for hearing on September 14, which was the first day of the trial. However, we have no record of that hearing, no record of the district court's ruling on its admissibility, and no record that ACI ever offered exhibit 314 during the trial.

[30] Generally, a motion which is never called to the attention of the court is presumed to have been waived or abandoned by the moving party, and, where no ruling appears to have been made on a motion, the presumption is, unless it otherwise appears, that the motion was waived or abandoned.[88] Because no ruling appears to have been made on the motion, we find that the motion was either waived or abandoned. And because we find no evidence that ACI ever offered exhibit 314 at the trial, we cannot say that the district court abused its discretion in not admitting it where it was never given the opportunity to do so.

Even if the evidence obtained in the federal trial had been improperly excluded, we fail to see how such exclusion would

---

[87] *Id.*

[88] *Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc.*, 235 Neb. 207, 454 N.W.2d 671 (1990).

- 880 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

have unfairly prejudiced ACI. In other words, we fail to see how the evidence obtained during the federal trial would have showed that ACI's claim was filed with good faith and not with the purpose of interfering with BHMI's business expectations. It is undisputed that ACI did not have the materials contained within exhibit 314 at the time it filed the initial lawsuit against BHMI and thus these materials could not have formed the basis of its suit.

We now turn to ACI's argument that the district court erroneously excluded testimony that ACI survived motions to dismiss and motions for summary judgment. ACI argues that the district court should have allowed the testimony, because it would have showed that ACI's lawsuit was not a "'sham exception'" for purposes of the *Noerr-Pennington* defense.[89] However, because we held that ACI waived *Noerr-Pennington* by failing to plead it as a defense, we cannot find that the district court abused its discretion in excluding this evidence where it had no prejudicial effect on ACI.

Because there is no record that ACI ever offered exhibit 314 at the trial and because the testimony at issue would have had no prejudicial effect on ACI, we cannot find that the district court erroneously excluded this evidence. We therefore conclude that the district court did not abuse its discretion in overruling ACI's motion to vacate the 2015 judgment for this reason, and we find this error is without merit.

### 3. Attorney Fees

Lastly, ACI assigns that the district court abused its discretion in awarding BHMI $2,732,962.50 in attorney fees and costs. We note that ACI does not argue that BHMI was not entitled to costs and attorney fees; § 59-821 allows a party injured by a violation of the Junkin Act to recover the costs of suit, including a "reasonable attorney's fee." Instead, ACI

---

[89] Brief for appellant at 47 (citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., supra* note 31).

- 881 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
296 NEBRASKA REPORTS
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

argues that the amount of the award was an abuse of discretion for two reasons. First, ACI argues that the district court could not have applied the factors set forth in our case law for determining a reasonable attorney fee, because BHMI did not offer legal invoices into evidence. Second, ACI argues that the district court had no basis for multiplying BHMI's rate.

[31] We have generally said that if an attorney seeks a statutory attorney fee, that attorney should introduce at least an affidavit showing a list of the services rendered, the time spent, and the charges made.[90] Here, BHMI submitted into evidence an affidavit executed by Davidson, the chair of a local law firm's litigation section, attesting to the reasonableness of the fees submitted by the law firm representing BHMI. In the affidavit, Davidson set forth the hours and rates of the attorneys and professional staff who worked on the case, which was based upon a detailed summary of work provided by counsel for BHMI. We note that ACI did not submit any evidence to dispute the contents of the affidavit. Although BHMI did not submit any legal invoices into evidence, we are unaware of any relevant information that would have been contained in the legal invoice that was not also in Davidson's affidavit. Based on our review of the affidavit, we conclude that it provided sufficient information upon which the district court could determine proper and reasonable attorney fees.

[32] We now turn to ACI's argument that the district court abused its discretion in applying a multiplier to the fee. When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion.[91] An award of attorney fees involves consideration of such factors as the nature of the case, the services performed and results obtained,

---

[90] *Black v. Brooks*, 285 Neb. 440, 827 N.W.2d 256 (2013).

[91] See cases cited *supra* note 13.

the length of time required for preparation and presentation of the case, the customary charges of the bar, and general equities of the case.[92]

Here, the district court found that the high risk and complex nature of the case warranted significant attorney fees, explaining that antitrust actions are one of the most difficult actions to litigate. Moreover, the court noted that the subject matter of the case involved highly technical issues relating to software and concepts such as source code, object code, application programming interfaces, "wrappers, literals, defines, and other technical concepts that are not generally understood by laypeople." The court further noted that the case was vigorously contested by both parties and involved two protracted jury trials.

As for the services performed, the district court found that claims under the Junkin Act have rarely been litigated in Nebraska and that prosecuting such a claim required skill, care, and diligence. Moreover, the work involved extensive discovery and research, working with experts, and strategizing for and attending trial, among other tasks. The parties exchanged "tens of thousands" of pages of documents during the course of discovery and were required to review "tens of thousands" of other documents from nonparties. Additionally, the case involved numerous depositions, which required the parties to travel out of state to St. Louis, Missouri, and Chicago, Illinois.

As for the results obtained, the district court found that BHMI's case was the only case within the last 100 years where a party successfully proved a Junkin Act claim. The court further noted that counsel for BHMI obtained an "excellent result" for BHMI, which warranted an enhancement of the attorney fees. As for the length of time required to prepare the case, the district court found that the case involved extended litigation, which required BHMI's attorneys,

---

[92] See *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008).

- 883 -

Nebraska Supreme Court Advance Sheets
296 Nebraska Reports
ACI WORLDWIDE CORP. v. BALDWIN HACKETT & MEEKS
Cite as 296 Neb. 818

paralegals, and technical support staff to devote over 2,800 hours to the case.

After reviewing the district court's detailed explanation for its award of attorney fees, we agree that the above factors support a significant attorney fee. We therefore find that the district court did not abuse its discretion in awarding BHMI $2,732,962.50.

## VI. CONCLUSION

For the reasons set forth above, we conclude that the district court did not abuse its discretion in overruling ACI's motions to vacate the 2014 and 2015 judgments and did not abuse its discretion in awarding BHMI $2,732,962.50 in attorney fees. We therefore affirm.

AFFIRMED.

MILLER-LERMAN, J., not participating.